**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Rhonda Kay Ariss, | : | Case No. 5:10-CV-1176 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM   DECISION AND ORDER** |
| Commissioner of Social Security**,** | : | |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and for Supplemental Security Income (SSI) under Title XVI of the Act. Pending are the parties' Briefs on the Merits and Plaintiff's Reply (Docket Nos. 15, 18 & 19).  For the reasons that follow, the Commissioner's decision is affirmed.

**I. PROCEDURAL BACKGROUND.**

On April 12, 2006, Plaintiff filed applications for DIB and SSI alleging that she became unable to work on March 1, 2003, because of her disabling condition (Docket No. 11, Exhibit 6, pp. 2-4, 8-10 of 26).  Plaintiff's requests were denied initially and upon reconsideration (Docket No. 11, Exhibit 4, p. 2-5, 8-10, 14-16, 18-20 of 21).  Plaintiff filed a timely request for hearing and on October 14, 2008, Administrative Law Judge (ALJ) Mark R. Dawson held a hearing at which Plaintiff, represented by counsel, and Vocational Expert (VE) Kathy Rice attended and testified (Docket No. 11, Exhibit 2, p. 24 of 42).  On November 10, 2008, ALJ Dawson issued an unfavorable decision (Docket No. 11, Exhibit 2, p. 16 of 42).  On April 17, 2010, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner (Docket No. 11, Exhibit 2, pp. 2-4 of 42).  Plaintiff filed a timely Complaint in this Court seeking judicial review (Docket No. 1).

## II.  FACTUAL BACKGROUND.

A.    **PLAINTIFF'S TESTIMONY**.

Plaintiff, a high school graduate, was 53 years of age, weighed 180 pounds and was 5'7" tall.  She was married with no minor children (Docket No. 11, Exhibit 2, pp. 27-28).

Plaintiff, a veteran of the United States Army, engaged in past relevant work as a babysitter and a customer service representative.  In the Army, Plaintiff was a cook (Docket No. 11, Exhibit 2, p. 27 of 42).  As a babysitter, Plaintiff cared for four children simultaneously (Docket No. 11, Exhibit 2, p. 30 of 42).  At the Akron Automobile Dealers, Plaintiff obtained license plates for dealers and customers and assisted customers reinstate their licenses (Docket No. 11, Exhibit 2, pp. 28-29 of 42).

Plaintiff opined that she was now precluded from work by pain throughout her body.  She

had headaches and shooting pains from her head to her arms and hands.  Her hands were persistently numb which affected her ability to grasp and hold any object that weighed more than a gallon of milk  Plaintiff described the pain in her lower back and hip as severe.  The pain in her legs radiated to her right foot which went numb "all the time."  When in pain, she could not walk very far or stand.  Neither could she sit for extended periods of time (Docket No. 11, Exhibit 2, pp. 29-30 of 42).

Plaintiff had undergone surgery on her neck and part of her cervical spine was "actually fixed."  Plaintiff had two plates in her neck.  She had not gotten the relief contemplated from the insertion of these plates.  To treat the pain, Plaintiff used a heating pad on her back and an ice pack on her neck.  She advised that she had used a heating pad so often that she sustained a topical burn (Docket No. 11, Exhibit 2, pp. 30-31 of 42).

Plaintiff felt controlled by the pain.  During a typical day, she got up and took her pain medication.  She took care of her personal hygiene .  Her daily activities consisted of sitting and limited walking around the apartment (Docket No. 12, Exhibit 2, p. 31 of 42).  Prior to the onset of chronic pain, she had kept her home spotless, cooked for her family, cared for her son and occasionally vacationed.  Now, she could not maintain that pace.  She could not drive or ride for any length of time without suffering for two days after arriving at her destination (Docket No. 11, Exhibit 2, p. 30 of 42).

**B.**     **VE TESTIMONY**.

The VE characterized Plaintiff's past relevant work as a license bureau clerk, a semi-skilled job with a specific vocational preparation of over one month and up to and including three months, as work performed by Plaintiff at the medium exertional level.  Employment as a child care worker,

too, had a specific vocational preparation of over one month and up to three months.  The work performed in the role of babysitter was considered semi-skilled, medium work (Docket No. 11, Exhibit 2, p. 32 of 42).

At this juncture, counsel interjected that Plaintiff had a residual functional capacity for sedentary to less than sedentary work.  Plaintiff had an extensive fusion performed and she had recurring problems with stenosis.  She also had degenerative changes in the lower spine and strength difficulties in her lower and upper extremities.  Because Plaintiff had passed her fiftieth birthday, a finding of sedentary work was appropriate under Grid Rule 201.14.  The ALJ agreed to look at this evidence in addition to the two prior applications of August 11, 2004, and April 12, 2005, to ascertain what the actual final date was and whether these cases had been appealed.

### III.  MEDICAL EVIDENCE.

Beginning in September 1998, Dr. Anne S. Grantham, M. D., a family practitioner, addressed issues related to Plaintiff's low back pain, neck and shoulder pain, asthma flare-ups, depression, edema, epigastric tenderness, migraine headache, sinusitis, a skin lesion and swimmer's ear.  Several narcotic and analgesic pain relievers such as Oxycontin, Vicodin and Percocet were prescribed to address prevailing symptoms of pain.  Antibiotics were prescribed to treat the sinusitis.  Dr. Grantham froze the skin lesion with liquid nitrogen and excised it (Docket No. 11, Exhibit 8, pp. 4-11 of 14; Exhibit 9, pp. 6-36 of 36).

Plaintiff complained of headaches with neck and arm pain.  The computed tomography (CT) scans of January 21, 2002, were negative for impairment (Docket No. 11, Exhibit 14, p. 12 of 37).

On April 11, 2002, Dr. Grantham ordered an echocardiogram.  The results from the

4

echocardiogram showed trace mitral valve insufficiency and trace tricuspid valve insufficiency (Docket No. 11, Exhibit 13, p. 13 of 25).  The bone scan from April 23, 2002, showed mild degenerative changes in the shoulder and hips.  The presence of sinusitis was questioned with the mild increased uptake in the region of the ethmoid sinuses.

Dr. Grantham noted that Plaintiff was having some problems with anxiety and depression on July 2, 2002 (Docket No. 11, Exhibit 14, p. 10 of 37).

On August 14, 2002, Dr. Grantham prescribed Percodan to treat right shoulder and arm pain (Docket No. 11, Exhibit 9, p. 17 of 36).  In December, she prescribed Xanax, a medication to treat anxiety disorders, Singular, a medication to prevent asthma attacks and an inhaler to assist breathing (Docket No. 11, Exhibit 9, p. 14 of 36).

The magnetic resonance imaging (MRI) administered on August 15, 2002, showed mild disc bulge and small posterior osteophytes at C2-C3 and C3-C4 but they did not markedly impress the spinal cord.  There was also moderate posterior disc and small posterior osteophytes at C5-C6 with mild impression on the spinal cord and mild spinal stenosis (Docket No. 11, Exhibit 14, p. 8 of 37).

Plaintiff commenced treating at the Veteran's Administration Hospital (VA) in 2003 for several impairments including sinus congestion, earache, migraines, back pain and right hand pain (Docket No. 11, Exhibit 19, pp. 3-34 of 39).  Diagnosed with acute sinusitis, Plaintiff was prescribed an antibiotic (Docket No. 11, Exhibit 15, p. 27 of 42).  The earache was treated with a morphine timed released medication (Docket No. 11, Exhibit 15, p. 31 of 42).

On January 6, 2003, Dr. Grantham provided two prescriptions for Oxycodone.  Plaintiff was taking Percocet and sometimes extra doses of Oxycodone to "hold the pain."  Plaintiff

supplemented this regiment with Vicodin to treat headaches.  The physical examination showed marked tightness in the paraspinous muscles in the lumbosacral area and diffuse tenderness in the upper back and shoulders (Docket No. 11, Exhibit 9, p. 28 of 36).

The MRI of Plaintiff's lumbar spine that was taken on July 2, 2003, showed mild degenerative change to the lumbosacral spine most notably involving the left intervertebral foramen at L2-3 (Docket No. 11, Exhibit 14, p. 5 of 37).  On July 11, 2003, Dr. Grantham discussed the results from the MRI, not specifically that a noticeable disc bulge at L2, L3, L4 and L5 resulted in intravertebral foramen narrowing.  Plaintiff continued to experience considerable bone pain even though the bone scan completed a year earlier was normal (Docket No. 11, Exhibit 10, p. 4 of 29).  The bone density examination administered on July 14, 2003, was indicative of low bone mineral density (Docket No. 11, Exhibit 13, p. 6 of 25).

On August 20, 2003, Dr. Grantham treated a sinus infection (Docket No. 11, Exhibit 10, p. 8 of 29).

The CT scan of Plaintiff's pelvis taken in October 2003, was negative.  No soft tissue mass adjacent to the right sacroiliac joint or osteolytic or osteoblastic bone lesions were seen (Docket No. 11, Exhibit 14, p. 2 of 37).  Dr. Grantham added a synthetic steroid to the medication regime prescribed to treat pain and depression in October 2003 (Docket No. 11, Exhibit 10, p. 10 of 29).

In November 2003, Plaintiff was seen at the VA's pain clinic.  Consideration was given to the use of an antidepressant so that Plaintiff could "wean back" on Oxycodone (Docket No. 11, Exhibit 19, p. 15 of 39).  Dr. Grantham administered an aerosol to assist breathing on November 20 and December 1, 2003 (Docket No. 11, Exhibit 10, p. 13 of 29).

On January 13, 2004, Dr. Grantham noted that Plaintiff fell.  Since the fall, Plaintiff had

"a lot of spasm and tenderness" along her spine (Docket No. 11, Exhibit 10, p. 17 of 29).

By February 2004, Plaintiff's sinusitis was resolving.  However, preventative medication for treatment of migraines was added to the drug therapy (Docket No. 11, Exhibit 10, p. 19 of 29).

In April 2004, Plaintiff called Dr. Grantham to report dizziness and nausea which was attributed to the antibiotics (Docket No. 11, Exhibit 10, p. 24 of 29).  On April 30, 2004, Plaintiff was diagnosed with chronic sphenoid sinusitis (Docket No. 11, Exhibit 13, pp. 24, 25 of 25).  The levels of nitrogen in the blood were elevated (Docket No. 11, Exhibit 14, p. 18 of 37).

In June 2004, Dr. Grantham noted that Plaintiff reported some improvement of her back and leg pain after epidural injections (Docket No. 11, Exhibit 10, p. 28 of 29).  On June 29, 2004, Plaintiff underwent several diagnostic tests of the ankle, cervical spine, knees and paranasal sinuses.  Plaintiff's right ankle showed no bone abnormality (Docket No. 11, Exhibit 13, p. 21 of 25).  Plaintiff's cervical spine showed evidence of C6-7 anterior cervical fusion and autofusion of C2-2.  Some neural foramen narrowing on the left upper cervical spine existed (Docket No. 11, Exhibit 13, p. 23 of 25).  Plaintiff's left knee showed no joint effusion or significant degenerative change and the right knee showed slightly more narrowing of the femoral/tibial joint compartment (Docket No. 11, Exhibit 13, p. 20 of 25).  No base view of the sinuses could be obtained because of the prior cervical fusion (Docket No. 11, Exhibit 13, p. 22 of 25).

On July 8 and October 25, 2004, Dr. Grantham noted that Plaintiff had some respiratory distress so she administered an aerosol.  Plaintiff's air exchange improved and she felt better (Docket No. 11, Exhibit 10, pp. 29 of 29; Exhibit 11, p. 7 of 26).

On July 12, 2004, the results from a nerve conduction study of both lower extremities were

considered normal (Docket No. 11, Exhibit 13, p. 4 of 25).  On July 28, 2004, Plaintiff was doing "pretty well with the lower back pain after she had some epidural injections" (Docket No. 11, Exhibit 11, p. 2 of 26).

On August 10, 2004, Plaintiff was treated for allergic rhinitis with a component of sinusitis (Docket No. 11, Exhibit 11, p. 3 of 26).

Results from the MRI scan of the spinal canal administered on August 10, 2004, showed a prior fusion of C5 and 6, posterior osteophytes and associated disc protrusions at C2-3 and C3-4, hypertrophic changes of the posterior end-plates of C5 and 6 and near abutment but no definite flattening of the spinal cord (Docket No. 11, Exhibit 13, p. 18 of 25).

On August 11, 2004, the results from the electromyogram obtained of Plaintiff's left and right arms were normal (Docket No. 11, Exhibit 13, p. 19 of 25).

Plaintiff's left foot pain was attributed to a non-displaced fracture involving the second proximal bones in the fingers and toes on November 30, 2004.  The remaining bony structures were intact (Docket No. 11, Exhibit 13, p. 16 of 25).

Dr. Grantham administered aerosol treatments on January 11 and January 31, 2005, to assist air exchange.  Plaintiff reported moving air much more readily after each exchange (Docket No. 11, Exhibit 11, pp. 12, 13 of 26).

In February 2005, Plaintiff underwent a complete pulmonary function test and bronchial spasm examination.  The results showed "mild large airways obstructive ventilatory defect" with an immediate response to substances that dilated the bronchioles and elevated airway resistance (Docket No. 11, Exhibit 11, p. 23 of 26).

Dr. Grantham treated Plaintiff for a sinus headache on July 31, 2003 (Docket No. 11,

Exhibit 10, p. 5 of 29).

Dr. Margaret Panzner, a physician employed by the Veteran Administration Hospital (VA), ordered an MRI of Plaintiff's spine on November 12, 2005.  The results confirmed anterior fixation instrumentation at C3 through C7.  However, there was no spinal abnormality, cord compression or foraminal compromise (Docket No. 11, Exhibit 17, p. 5 of 48).

On December 1, 2005, Dr. Panzer ordered X-rays of the paraspinal sinuses (Docket No. 11, Exhibit 17, pp. 3 of 48; 14-15 of 48).

On February 24, 2006, Dr. Panzner prescribed medication to treat depression (Docket No. 11, Exhibit 18, p. 30 of 45).  Plaintiff's cervical cord decompression was linked to the right hand pain which was more like carpal tunnel syndrome.

On or about April 24, 2006, a request for prosthetics was made (Docket No. 11, Exhibit 15, pp. 8-9 of 42).  Medication prescribed for anxiety was approved on April 24, 2006 (Docket No. 11, Exhibit 18, pp. 15-18 of 45).  In addition, Dr. Panzner ordered small wrist braces for a provisional diagnosis of carpal tunnel syndrome.  Over the course of the next six months, Plaintiff's medication regime to treat anxiety, asthma and body pain was monitored by Dr. Panzner (Docket No. 11, Exhibit 17, pp. 21-22 of 48; Exhibit 18, pp. 2-32 of 45).

Plaintiff presented to the Emergency Room at Cuyahoga Falls General Hospital on May 13, 2006, complaining of chest pain.  The chest pain was considered atypical.  In addition, the attending physician treated Plaintiff for migraine headaches (Docket No. 11, Exhibit 14, pp. 33-37 of 37).

On July 20, 2006, Dr. Karla Voyten, Ph. D., a clinical psychologist, completed the psychiatric review and determined that Plaintiff did not have a mental issue (Docket No. 11,

9

Exhibit 16, p. 14 of 30).

On July 29, 2006, Dr. Kamala Saxena, M. D., opined that Plaintiff had the following exertional/manipulative limitations:

1.   Occasionally lift and/or carry twenty pounds.
2.   Frequently lift and/or carry ten pounds.
3.   Stand and/or walk about six hours in an eight-hour workday.
4.   Sit about six hours in an eight hour workday.
5.   Push and/or pull on an unlimited basis.
6.   Occasionally climb using a ramp/ stairs.
7.   Never climb using a ladder/rope/scaffold.
8.   Occasionally kneel.
9.   Occasionally crouch.
10.  Occasionally crawl.
11.  Limited reaching, handling or fingering in all directions.

In addition, Dr. Saxena determined that Plaintiff should avoid all exposure to fumes, odors, dusts, gases, and poorly ventilated environments (Docket No. 11, Exhibit 16, pp. 16-21 of 30).

Dr. Panzner commenced iron therapy to treat restless leg syndrome on October 17, 2006 (Docket No. 11, Exhibit 17, p. 46 of 48).  Dr. Panzner prescribed Oxycodone and a nasal spray to assist breathing on October 23, 2006 (Docket No. 11, Exhibit 17, pp. 17, 43 of 48).  Dr. Panzner opined on October 18, 2006, that without observable limits, Plaintiff could

1.   Lift/ carry ten pounds.
2.   Stand/walk for a total of one hour, one fourth of which would be without interruption.
3,   Sit without limitation.
4.   Interact appropriately with the general public, ask simple questions, get along with co-workers or peers without distracting them, maintain socially appropriate behavior and set realistic goals or make plans independently of others.

(Docket No. 11, Exhibit 16, pp. 27-28 of 30).

Dr. Panzner concluded that Plaintiff had a significant functional impairment requiring daily long-acting narcotics to control the pain.  It was her opinion that Plaintiff's pain control had been

10

inadequate (Docket No. 11, Exhibit 16, p. 30 of 30).

On December 3, 2006, Dr. Katherine Lewis, Psy. D., reviewed the file and determined that there was no evidence in the file of psychologically related allegations at the reconsideration level of review (Docket No. 11, Exhibit 19, p. 36 of 39).  Dr. Anton Freihofner, M. D., confirmed Dr. Lewis' finding on December 3, 2006 (Docket No. 11, Exhibit 19, p. 37 of 39).

The x-ray of Plaintiff's shoulders on December 14, 2006, showed no degenerative changes or fracture dislocation (Docket No. 11, Exhibit 20, pp. 7-8 of 42).

On February 9, 2007, VA medical personnel compared the MRI of the lumbar spine with the X-ray of the lumbar spine of November 7, 2003.  The lumbar vertebral body heights and alignment were normal; there was a small protrusion of the cartilage at endplate; there was a small posterior disc bulge at L5-S1 and there were small posterior disc bulges at L2-L3 to L4-L5 (Docket No. 11, Exhibit 20, p. 4 of 42).

On August 24, 2007, VA personnel evaluated Plaintiff's treatment plan and found that Plaintiff had demonstrated functional improvements and she had demonstrated pain intensity improvements.  There was no evidence of drug addiction, drug abuse or diversion (Docket No. 11, Exhibit 20, p. 25 of 42).

On September 12, 2007, Plaintiff's pain appeared to be well controlled on the drug regimen which included but was not limited to a bronchodilator, steroidal medication to assist with breathing, a narcotic pain reliever and a hormone used to regulate thyroid activity (Docket No. 11, Exhibit 20, pp. 23-24 of 42).

On December 7, 2007, Plaintiff's spouse called the VA requesting medication to assist Plaintiff to quit smoking. The VA did approve medication to relieve nerve pain and migraines

11

(Docket No. 11, Exhibit 22, pp. 29-31 of 41). Plaintiff's depression was well controlled; however, she had three migraine headaches during the month. Her migraine medication was refilled (Docket No. 11, Exhibit 22, p. 33 of 41).

The right and left hip X-rays administered on May 19, 2008, showed osseous structures in both hips; the joint spaces and soft tissues were normal; and there was no significant degenerative changes or acute bony abnormality (Docket No. 11, Exhibit 22, p. 3 of 41). The X-rays of the lumbar spine showed no acute bone abnormality or significant degenerative changes or evidence that the spine had slipped out of the proper position into the bone below it (Docket No. 11, Exhibit 22, p. 4 of 41). The cervical spine X-rays showed no fracture and its alignment was satisfactory (Docket No. 11, Exhibit 22, p. 5 of 41).

## IV. STEPS TO SHOWING ENTITLEMENT TO SOCIAL SECURITY BENEFITS.

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); See also 20 C.F.R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)). The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively. To assist clarity, the remainder of this decision refers only to the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first

12

demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time her or she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits the claimant's physical or mental ability to do basic work activities.  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V. THE ALJ'S FINDINGS.

Upon consideration of the evidence, the ALJ found that through the date last insured:

1.   Plaintiff met the insured status requirements of the Act through December 31, 2007.

2.   Plaintiff had not engaged in substantial gainful activity from March 1, 2003, through the date last insured.

3.   Plaintiff had severe impairments:  disorders of the spine and asthma.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

13

4.      Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), except occasional crouching, balancing, stooping, climbing, kneeling and crawling.

5.      Plaintiff's past relevant work as a license bureau clerk did not require the performance of work related activities precluded by her residual functional capacity.

6.      Plaintiff was not under a disability as defined in the Act at any time from March 1, 2003, through December 31, 2007, the date last insured.

(Docket No. 11, Exhibit 2, pp. 16-23 of 42).

## VI. STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision of the Commissioner. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

14

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

## VII. DISCUSSION.

Plaintiff argues that:

1. The ALJ improperly regarded the opinions of Dr. Panzner or improperly disregarded her opinions.
2. The ALJ improperly equated Plaintiff's ability to engage in daily activities as evidence that she can perform competitive full-time work on a sustained basis.
3. The ALJ failed to find that Plaintiff's asthma was a severe impairment.
4. The ALJ failed to acknowledge any mental limitations.

Defendant argues that:

1. The ALJ reasonably assessed Dr. Panzner's opinions.
2. The ALJ reasonably assessed the effect of Plaintiff's daily living activities.
3. The ALJ reasonably assessed Plaintiff's asthma and mental impairments.

**A.    DID THE ALJ ERR IN ATTRIBUTING WEIGHT TO THE TREATING SOURCE OPINIONS?**

Plaintiff claims that the ALJ erred in not giving Dr. Panzer's medical opinions controlling weight and this error warrants a remand. In the alternative, the ALJ's rationale for discounting Dr.

15

Panzer's medical opinions are not supported by the evidence.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. *McCombs v. Commissioner of Social Security,* 2010 WL 3860574, *6 (S. D. Ohio) (*citing* 20 C.F.R. §§ 404.1527(d), 416.927(d)).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of the claimant's impairment(s), including symptoms, diagnosis and prognosis, what the claimant can still do despite impairment(s), and the claimant's physical or mental restrictions." *Id.* (*citing* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).  Some opinions, such as those from examining and treating physicians, are normally entitled to greater weight.  *Id.* (*citing* 20 C.F.R. §§ 404.1527(d), 416.927(d)).

To qualify as a treating source, the acceptable medical source must have examined the claimant and engaged in an ongoing treatment relationship with the claimant consistent with accepted medical practices.  *Id.* (*citing Smith v. Commissioner of Social Security,* 482 F.3d 873, 875 (6th Cir. 2007) (*quoting* 20 C.F.R. § 404.1502)).  The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances.  *Cross v. Commissioner of Social Security*, 373 F. Supp.2d 724, 729 -730 (N. D. Ohio 2005).  Generally, more weight is attributed to treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  If such opinions are "well-supported by

16

medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. *Id.* (*citing* 20 C. F. R. § 404. 1527(d)(2)).

In this case, the ALJ acknowledged that Dr. Panzner was a treating physician and attributed substantial deference to Dr. Panzner's opinions about the treatment of Plaintiff's pain and depression (Docket No. 11, Exhibit 2, p. 21 of 42, ¶ 6). When the ALJ compared Dr. Panzner's opinions to the diagnostic tests administered on December 14, 2006, he found that there was no evidence of an acute fracture or dislocation or degenerative changes in Plaintiff's shoulders (Docket No. 11, Exhibit 20, pp. 5-6 of 42). The MRI of Plaintiff's lumbar spine conducted on February 9, 2007, showed **small** posterior bulges in the lumbar spine (Docket No. 11, Exhibit 20, p. 4-5 of 42). Dr. Panzner reported on August 29, 2007, that the antidepressant was helping to stabilize Plaintiff's mood. She was no longer depressed and her pain was being controlled on the current regimen (Docket No. 11, Exhibit 20, pp. 24-26 of 42). This medical evidence was not conclusive that Plaintiff's pain or depression were of the severity to be disabling. Accordingly, the ALJ discounted Dr. Panzner's opinions about Plaintiff's functional limitations as they were internally inconsistent with the medical evidence.

The ALJ employed the correct legal standards for review of the treating physician's findings and the basis for discounting Dr. Panzner's opinions is substantially supported by the record. The Commissioner's finding must, therefore, be affirmed.

**B.** **DID THE ALJ ERR IN ASSESSING PLAINTIFF'S ABILITY TO PERFORM SPORADIC DAILY ACTIVITIES?**

Plaintiff contends that the ALJ relied on her ability to perform sporadic daily living tasks in determining whether she could perform substantial gainful activity.

17

Generally, in determining whether a claimant is disabled, SSA considers all of the claimant's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. *Thompson v. Astrue,* 2009 WL 3063380, *22 (S. D. Ohio 2009). Objective medical evidence is construed as medical signs and laboratory findings as defined in § 404.1528(b) and (c). *Id.* Other evidence is construed as the kinds of evidence described in §§ 404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e). *Id.* These include statements or reports from the claimant, the claimant's treating or examining physician or psychologist, and others about the claimant's medical history, diagnosis, prescribed treatment, **daily activities**, efforts to work and any other evidence showing how the claimant's impairment(s) and any related symptoms affect the claimant's ability to work. Title 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C.1 defines "activities of daily living" as follows:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of [a claimant's] overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C.1 (Thomson Reuters 2011).

In the instant case, the ALJ considered Plaintiff's daily activities as probative evidence that Plaintiff was not inconvenienced by pain when shopping for three hours weekly, feeding and walking her dog daily, preparing an evening meal daily, dusting, cleaning, washing some dishes occasionally and watching television and reading daily. All of these activities required walking, standing, bending and considerable sitting. The ALJ concluded that these activities were indicative that Plaintiff could perform some sustained activity. The ALJ did not equate her ability to engage

18

in daily activities to the performance of full-time work on a sustained basis.

Under the regulations, the ALJ was required to assess how Plaintiff's symptoms affected activities of daily living.  The Magistrate finds no error in the ALJ's consideration of Plaintiff's symptoms and a determination that her ability to sustain activities of daily living affected her ability to work.

**C.      DID THE ALJ ERR IN FAILING TO FIND THAT PLAINTIFF'S ASTHMA WAS A SEVERE IMPAIRMENT?**

In the decision, the ALJ initially found that Plaintiff's asthma was a severe impairment. Later in the decision, the ALJ concluded that Plaintiff's asthma was not a severe impairment as it was controlled by medication (Docket No. 11, Exhibit 2, p. 18 of 42).  Plaintiff contends that the ALJ erred in failing to find that her asthma was severe.

The Sixth Circuit has consistently held that if a condition is remediable through medication or treatment, it is not disabling for purposes of social security determination.  *Conner v. Astrue*, 2010 WL 455261, * 5 (M. D. Tenn. 2010) (*citing Harris v. Heckler*, 756 F. 2d 431, 436 n. 2 (6th Cir. 1985)).  An impairment that can be remedied by treatment will not serve as a basis for a finding of disability.  *Henry v. Gardner*, 381 F. 2d 191,195 (6th Cir. 1967).

On its face the ALJ's decision is ambiguous.  Initially, the ALJ acknowledged that Plaintiff's asthma was severe and that she regularly took several medications--Albuterol, Formoterol Fumarate and Levalbuterol.  Then he concluded that the impairment was not severe as it was controlled with medication.  The Magistrate finds that based on the evidence, the drug therapy was successful in suppressing symptoms and preventing flare-ups.  Since Plaintiff's symptoms could be treated with drug therapy, the impairment was not of the severity to serve as a basis for disability.  Clearly the ALJ's explanation lacked clarity; however, the ALJ did not err

19

by following the rules that require a finding that an impairment is not of the severity to assist in assessing disability if it responds to treatment.

**D.      DID THE ALJ ERR IN FAILING TO ACKNOWLEDGE ANY MENTAL IMPAIRMENTS?**

Plaintiff contends that the ALJ ignored any evidence of mental impairment even though Dr. Panzner completed a mental residual functional form and indicated that Plaintiff would have difficulty performing work.

The ALJ acknowledged that Plaintiff suffered from depression and he considered the affect of such illness on whether Plaintiff was under a disability.  The records from the VA show that Plaintiff was prescribed several medications generally used to treat anxiety disorders and depression. The ALJ referred to Dr. Panzner's notes that the antidepressant medication was helpful and that Plaintiff was no longer depressed; nor did she feel overwhelmed (Docket No. 11, Exhibit 2, p. 21 of 42).  Because her anxiety disorders and depression responded to medication and/or treatment, Dr. Panzner's mental residual functional assessment was not probative of whether Plaintiff had a severe mental impairment that was disabling.

The Magistrate finds that no error exists because the ALJ did not ignore the evidence of mental impairment.  He treated that evidence according to the rules that deem evidence of any impairment that responds to medication or treatment not relevant for purposes of disability determinations.

## VIII.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

20

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:   August 22, 2011